# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

BILLY WILKES, SR.,         )
         )
     **Plaintiff,**       )
         )
   **v.**         )     **CAUSE NO. 1:10-CV-169**
         )
CITY OF FORT WAYNE,      )
         )
     **Defendant.**    )

## OPINION AND ORDER

## I. INTRODUCTION

Plaintiff Billy Wilkes alleges that the City of Fort Wayne (the "City"), his former employer, violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111, *et seq.,* when it terminated him from his job as a heavy equipment operator without engaging in the interactive process and affording him a reasonable accommodation.[1] (First Am. Compl. ¶¶ 1, 7, 9.) Alternatively, Wilkes asserts that his termination was in retaliation for filing a worker's compensation claim and thus violated Indiana common law. (First Am. Compl. ¶ 10.)

The City now moves for summary judgment on all claims (Docket # 25), and the motion has been fully briefed, along with a sur-response, which the Court has considered. (Docket # 26-28, 35-37, 40-41, 43, 45.) For the reasons provided, the City's motion for summary judgment

---

[1] Accordingly, subject matter jurisdiction arises under 28 U.S.C. § 1331. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (Docket # 13.)

Wilkes also advanced disparate treatment and retaliation claims under the ADA in his complaint. However, he expressly abandoned the disparate treatment claim (Pl.'s Mem. in Supp. of Response in Opp'n to Mot. for Summ. J ("Resp. Br.") 16), and even though he filed extensive response and sur-response briefs, he has not made an argument of ADA retaliation and therefore it is deemed waived. *See McWilliams v. McWilliams*, No. 06c3060, 2006 WL 3775952, at *1-2 (N.D. Ill. Dec. 19, 2006) (explaining that skeletal, undeveloped, perfunctory or unsupported arguments are deemed waived).

will be GRANTED.

## II. FACTUAL BACKGROUND[2]

Wilkes began working for the City in 1994 on or about the age of nineteen as a full-time laborer in the City's street department. (Wilkes Aff. ¶ 2; Baumgartner Aff. ¶ 5; Def.'s App. Ex. H.)  The street department employs several different classifications of employees, including laborers, truck drivers, and various classes of equipment operators.[3] (Baumgartner Aff. ¶ 4.)  In 1996, Wilkes obtained an Indiana commercial driver's license ("CDL") and shortly thereafter became a truck driver for the street department. (Baumgartner Aff. ¶ 5.)

On September 24, 1999, Wilkes accepted the position of "Operator B" in the street department. (Baumgartner Aff. ¶ 6; Wilkes Dep. 35.)  An Operator B operates heavy equipment (including a loader and tractor with attachments, blade truck, vibratory roller, and backhoe) used in the daily maintenance and repair of the city streets and alley ways. (Baumgartner Aff. ¶ 6; Wilkes Dep. 31-35, Ex. A.)  An Operator B must, among other things, hold a CDL and perform duties which require bending, twisting, climbing, and lifting up to fifty pounds on a regular basis; and pushing, pulling, and reaching for sustained periods of time. (Wilkes Dep. Ex. A.)  Although Wilkes performed a variety of duties as an Operator B, including working on the backhoe and loader crews, his primary duty was driving a dump truck that pulled a flatbed

---

[2] For summary judgment purposes, the facts are recited in the light most favorable to Wilkes, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

[3] All of these employees are represented by Local 399 of the International Union of Operating Engineers, AFL-CIO (the "Union"), with which the City has entered into a collective bargaining agreement. (Baumgartner Aff. ¶ 4.)

trailer.[4] (Wilkes Dep. 35, 36; Wilkes Aff. ¶ 10.)

### A. Wilkes Sustains a Neck Injury When on Military Duty in 1999

From 1991 until 2004, Wilkes served in the United States Army Reserves. (Wilkes Dep. 10, 16.) While at a military drill in 1999, Wilkes suffered an injury to his neck when the collapsible ceiling of a mobile office fell on his head. (Wilkes Dep. 8, 10-15.) Wilkes received immediate medical treatment for the injury but did not receive any further treatment when he returned home. (Wilkes Dep. 14-15.) Although he continued to experience some discomfort in the form of a "stiff neck" after the accident, it did not interfere with his daily routine, and he was not assigned any medical restrictions as a result of the event. (Wilkes Dep. 15, 20.)

### B. Wilkes Takes Intermittent FMLA Leave for His Chronic Neck Pain in 2004 and 2005

On or around February 2003, Wilkes was called to active duty, and he went on military leave from the City until April 2004. (Baumgartner Aff. ¶ 9.) While on active duty, Wilkes began experiencing more severe neck pain from wearing a Kevlar helmet and other military equipment; upon examination, an MRI indicated that he had a herniated disk in his C4-5 region. (Wilkes Dep. 14-20, 28.) As a result, the Army medically discharged him on April 17, 2004. (Wilkes Dep. 16, 28-29.)

Soon thereafter, Wilkes returned to his job as an Operator B with the City. (Wilkes Dep. 21; Baumgartner Aff. ¶ 10.) Although he continued to experience some residual neck pain, it diminished somewhat after he left the Army and did not interfere with his ability to perform his Operator B duties. (Wilkes Dep. 22-24.) Wilkes did request, however, and was granted,

---

[4] The backhoe and loader crews entailed a variety of tasks that were assigned on the basis of seniority. (Wilkes Aff. ¶¶ 11-13.) During the relevant period, Wilkes was the second most senior member of the loader crew and the most senior member of the backhoe crew. (Wilkes Aff. ¶ 11.)

intermittent leave under the Family and Medical Leave Act ("FMLA") in 2004 and 2005 because of "chronic neck pain" and because his physician told him not to operate heavy equipment or drive under his CDL when taking prescription pain medications. (Wilkes Dep. 20-24, 29; Baumgartner Aff. ¶ 12; Townsend Aff. ¶ 6.)

### C. Wilkes Injures His Left Shoulder on the Job in November 2005 and Takes a Seven-Month Leave of Absence

In November 2005, Wilkes sustained a workplace injury to his left shoulder when the front loader he was operating struck a manhole cover. (Wilkes Dep. 61, 68-69.) He took an immediate leave of absence, and the City provided him worker's compensation benefits, including medical treatment for the injury. (Wilkes Dep. 68-69; Baumgartner Aff. ¶ 13; McAfee Aff. ¶ 8.) On February 22, 2006, Dr. Jerald Cooper at Fort Wayne Orthopaedics performed arthroscopic surgery and debridement on Wilkes's left shoulder, and Wilkes underwent physical therapy following the surgery. (Def.'s App. Ex. H.)

Dr. Cooper subsequently referred Wilkes to Dr. Thomas Lazoff at Physical Medicine Consultants for "oversight and recommendations", and on May 22, 2006, Dr. Lazoff restricted Wilkes from lifting more than ten pounds with the left upper extremity. (Def.'s App. Exs. H, I.) On June 6, 2006, Dr. Lazoff issued Wilkes the following permanent restrictions:

|  | Occasional | Frequent |
|---|---|---|
| Lifting from floor to waist | 100 lbs. | 70 lbs. |
| Lifting from waist to shoulder | 70 lbs. | 40 lbs. |
| Lifting from shoulder overhead | 50 lbs. | 25 lbs. |
| Carrying | 90 lbs. | 60 lbs. |
| Pushing/pulling | 220 lbs. | 150 lbs. |

No limitations on standing, sitting, or walking. He could frequently stoop, bend, squat, balance, and climb, and occasionally crawl secondary to the shoulder discomfort.

(Def.'s App. Ex. I.)  Dr. Lazoff concluded that even with these restrictions Wilkes still met the minimum criteria for his Operator B job duties, and therefore Wilkes returned to his job on June 8, 2006. (Def.'s App. Ex. I; Baumgartner Aff. ¶ 14; McAfee Aff. ¶ 11.)  On July 14, 2006, Dr. Lazoff opined that Wilkes was at maximum medical improvement ("MMI") concerning his left shoulder, maintained the same permanent restrictions, and gave him an impairment rating of twelve percent of the left upper extremity. (Def.'s App. Ex. I.)

### D. Wilkes Takes Intermittent FMLA Leave for His Chronic Neck Pain in 2007

In 2007, Wilkes again applied for intermittent FMLA leave due to his chronic neck pain. (Baumgartner Aff. ¶ 16; McAfee Aff. ¶ 12.)  In May 2007, after receiving his request, the City sent Wilkes to Dr. Mark Reecer for an independent medical examination, asking Dr. Reecer to evaluate Wilkes's ability to perform the duties on his Operator B job description and whether it would be safe for him to continue working without restrictions in that position. (McAfee Aff. ¶ 13, Ex. A.)  Based on a negative MRI and essentially unremarkable clinical findings, Dr. Reecer had "no issues" with Wilkes continuing his regular job duties and found "no indication for permanent restrictions." (McAfee Aff. Ex. B.)  Dr. Reecer did, however, agree with the intermittent leave request for managing Wilkes's chronic neck pain. (McAfee Aff. Ex. B.) Accordingly, the City re-certified Wilkes for intermittent FMLA leave, and Wilkes continued to take intermittent leave through the beginning of 2008 for his chronic neck pain. (Townsend Aff. ¶ 8.)  Nevertheless, when Wilkes underwent his medical exam for the CDL fitness determination in October 2007, he certified that his report of health history, which represented that he had no spinal injury or disease and no restrictions or limitations, was complete and true. (McAfee Aff. ¶

49.)

### E. Wilkes Injures His Right Shoulder on the Job in February 2008
#### But Continues His Operator B Duties Without Restrictions

On February 1, 2008, Wilkes fell off of the hood of his truck while at work and injured his right shoulder. (Wilkes Dep. 47-48; Baumgartner Aff. ¶ 17.) He continued to work his shift that day and did not immediately seek medical attention. (Wilkes Dep. 49.) However, about one week later, Wilkes saw Dr. Larry Rowe at Business Health Solutions ("BHS") for the shoulder injury. (McAfee Aff. ¶ 17.) An x-ray revealed a "normal shoulder", and BHS released Wilkes without restrictions. (Wilkes Dep. 49, 58-60; McAfee Aff. ¶ 18.) From February 14 to March 4, 2008, Wilkes received treatment for his right shoulder, including physical therapy and cortisone injections. (McAfee Aff. ¶ 18.) On March 4, 2008, BHS referred Wilkes to Dr. Cooper, who diagnosed him with right shoulder impingement. (Wilkes Dep. 49-50.) Wilkes continued, however, to perform his normal Operator B job duties. (Baumgartner Aff. ¶ 17.)

### F. Wilkes Injures Both Shoulders and His Back on the Job in March 2008
#### and Is Temporarily Restricted to Light Duty Work

On March 25, 2008, Wilkes was injured at work when the tractor that he was driving struck a piece of concrete. (Wilkes Dep. 63-64, Ex. E.) He immediately experienced pain in both shoulders and his back. (Wilkes Dep. 63-64, Ex. E.) Wilkes was diagnosed at BHS with cervical, thoracic, and lumbar strain and bilateral shoulder strain. (McAfee Aff. ¶ 19.) BHS restricted him from commercial driving and all bending, squatting, kneeling, climbing, reaching, pushing or pulling, and from work around moving machinery. (Wilkes Dep. 74; Def.'s App. Ex. J.) The City provided Wilkes with light duty work, which involved watching training videos in

the office.[5] (Wilkes Dep. 81-82; Baumgartner Aff. ¶ 19.)  Wilkes's restrictions were gradually

lessened, and in April 2008, he returned to his Operator B job without restrictions. (Wilkes Dep.

81-82; Baumgartner Aff. ¶ 20.)

### G.  Wilkes Injures His Back on the Job in April 2008 and Is Again Temporarily Restricted to Light Duty Work

On April 21, 2008, within a day or two of returning to full duty, Wilkes was injured when

he was trying to lift some traffic cones into his truck, experiencing a popping sensation in his

back which nearly caused him to fall to his knees. (Wilkes Dep. 70-71, Ex. G.)  The next day,

Dr. Rowe at BHS restricted Wilkes from lifting, pushing, or pulling more than ten pounds and

from commercial driving or operating heavy equipment. (Wilkes. Dep. 83-84, Ex. K.)  Wilkes

again was placed on light duty work where he watched training videos in the office. (Wilkes

Dep. 81-83; Baumgartner Aff. ¶ 21.)

Dr. Rowe at BHS referred Wilkes back to Dr. Lazoff, and Dr. Lazoff prescribed physical

therapy and continued Wilkes's restrictions. (McAfee Aff.  ¶¶ 29, 30; Def.'s App. Ex. I.)  On

May 14, 2008, Dr. Lazoff lessened Wilkes's restrictions to some degree. (Def.'s App. Ex. I.)  On

May 30, 2008, Dr. Lazoff noted "[n]o over-all improvement" to Wilkes's condition, and that

Wilkes reported that his right shoulder had never really improved and was still hurting him.

(Def.'s App. Ex. I.)  Dr. Lazoff also documented that the physical therapist was recommending

that Wilkes undergo a functional capacity evaluation ("FCE"), but that Wilkes did not think he

could do it because of his right shoulder condition. (Def.'s App. Ex. I.)  Accordingly, Dr. Lazoff

ordered another MRI of Wilkes's right shoulder, which showed mild acromioclavicular joint

---

[5] Per the City's policy, light duty work is rarely extended beyond ninety days and can never become a regular full-time position. (McAfee Aff. ¶ 23.)

degeneration, but "no change when compared to the prior MRI earlier this year". (Def.'s App. Ex. I.)  As a result, Dr. Lazoff recommended that Wilkes proceed with the FCE. (Def.'s App. Ex. I; Pl.'s App. Ex. 15.)

Before taking the FCE, Wilkes contacted Nan McAfee, the City's risk management representative, and told her he was not yet ready to take the FCE due to worsening problems with his right shoulder.[6]  (Pl.'s App. Ex. 15.)  Wilkes's worker's compensation attorney also sent several communications to the City's lawyer requesting that the FCE be postponed until after Wilkes completed his right shoulder treatment in order to obtain a valid result on the FCE. (McEntee Aff. ¶¶ 3-5.)  Nevertheless, the FCE was performed on June 26, 2008. (Pl.'s App. Ex. 13.)

### H.  Dr. Lazoff Assigns Wilkes Permanent Restrictions in July 2008

By July 2008, Wilkes had returned to operating a backhoe every day, acting as the lead backhoe operator on his crew.[7]  (Wilkes Dep. 97-98.)  Wilkes explains that his physical condition made it uncomfortable to operate a backhoe but did not prevent him from doing so. (Wilkes Dep. 100-03.)

However, on July 8, 2008, after reviewing the results of the FCE, Dr. Lazoff assigned Wilkes the following permanent restrictions:

| | | |
|---|---|---|
| Lifting from floor to waist | none | none |
| Lifting from waist to shoulder | 35 lbs. | 25 lbs. |
| Lifting from shoulder to overhead | none | none |

---

[6] Wilkes had been told by a supervisor that he would be terminated from his employment if the FCE showed that he could not perform his job, and thus he did not want to take the FCE at that time due to his right shoulder problems. (Wilkes Dep. 110.)

[7] Wilkes explained that he needed a CDL to drive the truck that carries equipment (such as a backhoe) but that it was not needed to operate the actual equipment. (Wilkes. Dep. 98-99.)

| Carrying | 30 lbs. | 20 lbs. |
| Pushing/pulling | 50 lbs. | 30 lbs. |

No restrictions on standing, walking, or sitting. He can frequently squat, balance, and climb stairs. Limited to only occasional stooping, bending, kneeling, or crawling.[8]

(Def.'s App. Ex. I.) One week later, Dr. Lazoff issued a report stating that Wilkes was at MMI; confirmed the permanent nature of the restrictions he had assigned the week before; and assigned additional restrictions of no use of vibrating equipment, including a backhoe or jackhammer. (Def.'s App. Ex. I; Pl.'s App. Ex. 10.) He further documented that he thought Wilkes's "overall set of complaints [were] somewhat inconsistent with the overall situation" and that no further intervention, such as injections or surgery, would be of benefit. (Def.'s App. Ex. I.)

### I. Wilkes Seeks Second Opinions From Dr. Cooper and Dr. Lazoff

Wilkes did not particularly disagree with the restrictions that Dr. Lazoff imposed; he believed, however, that they should be temporary in nature, rather than permanent. (Wilkes Dep. 99.) Realizing the potential impact of the permanent restrictions, Wilkes on his own initiative returned to Dr. Cooper on July 10, 2008, to inquire about further treatment for his right shoulder, as Dr. Cooper had successfully operated in his left shoulder in 2006 and his symptoms on his right shoulder were similar to those he experienced on his left shoulder. (Def.'s App. Ex. H.) Dr. Cooper reviewed Wilkes's June MRI and determined that there was no significant change since he had last seen Wilkes in April 2008. (Def.'s App. Ex. H.) Dr. Cooper offered arthroscopic intervention, but stated "[t]o what extent this will result in relief of his present complaints is

---

[8] The parties do not dispute that these restrictions conflict with the Operator B job description. (Wilkes Dep. 99-100.)

unclear." (Def.'s App. Ex. H.)  Dr. Cooper further opined: "He is on the permanent restrictions per Dr. Lazoff.  I have no change to these at this time." (Def.'s App. Ex. H.)

On July 15, 2008, Wilkes obtained a second opinion from Dr. Robert Shugart, also of Fort Wayne Orthopaedics, concerning his neck and back pain. (Def.'s App. Ex. K.)  He issued a report, in relevant part, as follows:

> Obviously there are two potential causes for his continued neck pain.  One could be myofascial from the injury he took.  It could potentially be discogenic as well. I told him the only option to discern the difference would be to consider cervical discography at 3-4, 4-5, 5-6, and 6-7.  If indeed he has multiple levels there really is no operative intervention.  If it is negative obviously one cannot surgically fix the myofascial component that he has, but it may elucidate the potential pain generator in the neck and upper shoulder.
> . . . .
>
> At this time as recommended, if indeed he feels his symptoms are not tolerable the only other option we have to at least discern whether this is discogenic at those levels would be to consider the cervical discography as noted.  At this time he does have restrictions per Dr. Lazoff.

(Def.'s App. Ex. K.)  Wilkes elected to proceed with the discography. (Wilkes Dep. Ex. D.)

On July 24, 2008, after reviewing the discography results with Wilkes, Dr. Shugart documented:

> We talked about options.  One could consider anterior cervical discectomy and fusion 5-6.  Success rate is probably in the 70-75 percent range, understanding that there may always be a myofascial component because with the disc injury there was likely also injury to some of the soft tissue that may continue.  Anterior cervical discectomy and fusion is usually 23, maximum medical improvement usually 12 weeks or so.  That would be the recommendation if he wishes to proceed and feels his symptoms are bad enough.

(Def.'s App. Ex. K.)

### J.  The City Terminates Wilkes's Employment on July 25, 2008

On July 16, 2008, Wilkes attempted to personally hand McAfee, the City's risk

management representative, Dr. Cooper's July 10th and Dr. Shugart's July 15th reports; McAfee, however, refused to accept them. (Wilkes Dep. 117; Pl.'s App. Ex. 11.) Later that same day, Wilkes faxed the documents to McAfee's office twice. (Wilkes Dep. 117-18; Pl.'s App. Ex. 11; Jenny Wilkes Aff. ¶ 4.) On July 18, 2008, Wilkes and his wife then scanned and e-mailed the documents to McAfee. (Wilkes Dep. 118; Pl.'s App. Ex. 11; Jenny Wilkes Aff. ¶ 6.)

After receiving Dr. Lazoff's July 2008 report assigning Wilkes permanent restrictions, McAfee met with the City's street commissioner, Brad Baumgartner, and the City's human resources director, labor manager, and benefits manager, to discuss the restrictions and Wilkes's job responsibilities. (McAfee Aff. ¶ 43.) Baumgartner advised the group that he did not believe that Wilkes would be able to perform his Operator B job duties, and McAfee stated that she did not believe he would be able to obtain the medical certification necessary to keep his CDL. (Baumgartner Aff. ¶¶ 23, 24; McAfee Aff. ¶¶ 38-41, 43.) Baumgartner also reported that there were no jobs open in the street department that Wilkes would be able to perform given his restrictions. (McAfee Aff. ¶ 43; Baumgartner Aff. ¶ 27.) Consequently, the decision was made to terminate Wilkes effective July 25, 2008. (McAfee Aff. ¶¶ 43-44; Baumgartner Aff. ¶ 25.)

On July 25, 2008, several officers for the City, including McAfee, met with Wilkes, his wife, and his Union representatives, and terminated his employment, explaining to him that the reason for the termination was that Dr. Lazoff had assigned him permanent restrictions that prevented him from performing the essential duties of the Operator B job. (Def.'s App. Ex. M; Wilkes Dep. 163; McAfee Aff. ¶ 44; Baumgartner Aff. ¶ 26.) Wilkes expressly disagreed with the City's position and explained that he had received second opinions from Dr. Cooper and Dr. Shugart that suggested surgery could fix his problems; he also attempted to hand them Dr.

Shugart's July 24, 2008, report. (Wilkes Dep. 131.)  The City, however, refused to take the

report, stating that "they were not interested, and that the hearing was simply to address his

termination."[9] (Jenny Wilkes Aff. ¶ 7.)  Wilkes asked the City not to terminate him until he had

the chance to undergo surgery with Dr. Cooper and Dr. Shugart and recover.[10] (Wilkes Dep. 161-

62.)  Nevertheless, the City terminated him.[11] (Def.'s App. Ex. M; McAfee Aff. ¶¶ 46-47.)

### K. Wilkes Undergoes the Surgeries by Dr. Cooper and Dr. Shugart After His Termination and Is Released to Work Without Restrictions on January 27, 2009

Wilkes underwent surgery on his right shoulder by Dr. Cooper on August 29, 2008, and

Dr. Cooper released him from all restrictions on his right shoulder on December 31, 2008.

(Wilkes Dep. 140, Ex. D.)  Wilkes also had fusion surgery on his neck by Dr. Shugart on

October 17, 2008, and was released to work without restrictions on January 27, 2009—six

months after he was terminated by the City.[12] (Wilkes Dep. 141.)

_____

[9] The City disputes that Wilkes talked about the second opinions and proposed surgery at this meeting or at any time prior to his termination. (Def.'s App. ¶ 117 n.2.)

[10] Wilkes also represents that from his March 25, 2008, injury until late 2008, he needed his wife's help to dress; was unable to tie his shoes, wash his hair, or cut up food; could not lift pots or pans with his right hand for cooking; had trouble showering; could not mow the law, garden, or pick up his children; could not walk more than fifty yards without stopping to rest; and could no longer engage in many leisure activities, including softball, golfing, swimming, or playing wiffle ball or tee-ball with his children. (Wilkes Aff. ¶ 8; Wilkes Dep. 85.)

[11] Although the City informed him in his termination letter that he was free to apply for other jobs with the City for which he was qualified, Wilkes did not apply for any other jobs at the City upon his discharge from the Operator B position. (Pilarski Aff. ¶ 6; Baumgartner Aff. ¶¶ 27, 43; Def.'s App. Ex. M.)
  The City notified Wilkes during the termination hearing that he could be eligible for long term disability benefits. (Wilkes Dep. 132-35; McAfee Aff. ¶ 45.)  Wilkes applied, and he was awarded disability benefits as of July 26, 2008. (Wilkes Dep. 132-35.)  His disability benefits, however, terminated six months later when he was released to return to work without restrictions. (Pl.'s App. Ex. 9.)

[12] In mid to late summer of 2009, Wilkes ruptured a disk in the C4-C5 section of his neck, which caused him to experience pain, headaches, dizziness, and sleep difficulties, and thus on September 16, 2009, he underwent another surgery. (Suppl. Wilkes Aff. ¶ 6; Wilkes Dep. 150-52.)  For at least twelve weeks following that surgery, he again was restricted from working. (Wilkes Dep. 150-52.)  At the time of his deposition on February 9, 2011, Wilkes testified that although he was still undergoing physical therapy from time to time and had no desire to return to heavy construction work, he "probably could" perform his Operator B duties. (Wilkes Dep. 145, 150-53.)
  Wilkes has not looked for a new job of any type since his termination, and instead opted to participate in a

### III.  STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770.  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.*  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.  A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.*  However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

### IV.  DISCUSSION

Here, Wilkes asserts a failure to accommodate claim under the ADA, contending that the City failed to engage in the interactive process or afford him a reasonable accommodation.  In the alternative, he contends that his termination was in retaliation for filing a worker's compensation claim and thus violated Indiana law.  Neither of Wilkes's claims will survive

---

vocational rehabilitation  program offered by the Veterans' Administration ("VA"). (Wilkes Dep. 142-48.) Curiously, in contrast to his deposition testimony that he "probably could" do his Operator B job, he represented to the VA near that same time that he was 'struggling with walking around campus with [his] cane and books at the same time"; he was "unable to 'walk or carry anything to classes"; and his physician determined that he was "unable to work". (Def.'s Suppl. Designation of Materials Ex. C.)

summary judgment.

### *A. Wilkes's Claim Under the ADA*

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment."[13] 42 U.S.C. § 12112(a); *Basith v. Cook Cnty.*, 241 F.3d 919, 926-27 (7th Cir. 2001). "Discriminating against a 'qualified individual with a disability' means, as is relevant to [Wilkes's] claim, not making a 'reasonable accommodation' where doing so would allow a disabled employee to 'perform the essential functions of the employment position' without imposing an 'undue hardship' on the employer." *Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1066 (7th Cir. 2008) (citing 42 U.S.C. §§ 12112(b)(5)(A), 12111(8)).

"In order to establish a prima facie case of . . . failure to accommodate, a plaintiff must first demonstrate that he has a 'disability' within the meaning of the ADA." *Wright v. Ill. Dept. of Corrs.*, 204 F.3d 727, 730 (7th Cir. 2000). The term "disability" is defined under the ADA as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[14] *Id.* (citing 42 U.S.C. § 12102(2)). "Major life activities include 'caring

---

[13] Congress made substantial changes to the ADA through the ADA Amendments Act of 2008 ("ADAA"), which took effect on January 1, 2009. *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 n.1 (7th Cir. 2010); *Kiesewetter v. Caterpillar*, 295 Fed. Appx. 850, 851 (7th Cir. 2008) (unpublished). The Seventh Circuit Court of Appeals has held that the ADAA does not apply retroactively. *Serwatka*, 591 F.3d at 962 n.1; *Kiesewetter*, 295 Fed. Appx. at 851. Consequently, the parties do not dispute that the Court should apply the ADA as it was written and interpreted on July 25, 2008—"when the complained-of acts occurred." *Kiesewetter*, 295 Fed. Appx. at 851.

[14] Thus, even if a plaintiff does not suffer from an impairment that substantially limits a major life activity, he still falls under the ambit of the ADA if his employer regarded him as disabled. *See* 42 U.S.C. § 12102. An employee is regarded as disabled if "1) the employer mistakenly believes the employee has a physical impairment that substantially limits a major life activity; or 2) the employer mistakenly believes that an actual, non-limiting

14

for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Wright*, 204 F.3d at 730 (quoting 29 C.F.R. § 1630.2(i)).

Here, Wilkes contends that he was substantially limited in the major life activity of working in July 2008 after Dr. Lazoff assigned him permanent restrictions.[15]  "As it has been defined, 'substantially limits' means that the person is either unable to perform a major life function, or is significantly restricted in the duration, manner, or condition under which the individual can perform a particular major life activity, as compared to the average person in the general population." *Contreras v. Suncast Corp.*, 237 F.3d 756, 762 (7th Cir. 2001) (citing 29 C.F.R. § 1630.2(j)).  When discussing the major life activity of working, "'substantially limits' means the individual is significantly restricted in the ability to perform a class of jobs or a broad range of jobs in various classes."[16] *Id.*  Therefore, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Burnett v.*

---

impairment substantially limits a major life activity." *Peters v. City of Mauston*, 311 F.3d 835, 843 (7th Cir. 2002); *see also Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001).  Stated another way, the employer "must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Peters*, 311 F.3d at 843 (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999)).

[15] Wilkes also lists a variety of daily tasks that he contends he could not perform after his March 25, 2008, injury.  He does not, however, develop an argument that he was substantially limited in a major life activity other than working, produce any evidence about the duration of these purported limitations, or suggest that the City was aware of them. *See Miller v. Ill. Dept. of Transp.*, 643 F.3d 190, 197 (7th Cir. 2011) (emphasizing that in a "regarded as" case, the focus is on the employer's subjective perception of the degree of plaintiff's impairments); *see generally McWilliams*, 2006 WL 3775952, at *1-2 (stating that undeveloped arguments are deemed waived).  In any event, Wilkes's contention that he could not walk more than fifty yards is *not* supported by Dr. Lazoff's report, which placed no restrictions upon his walking or standing. (Def.'s App., Ex. I.)

[16] "A 'class of jobs' is the job from which a claimant was disqualified, as well as other jobs utilizing similar training, knowledge, and skills within 'the geographical area to which the [claimant] has reasonable access.'" *EEOC v. Rockwell Int'l Co.*, 243 F.3d 1012, 1017 (7th Cir. 2001) (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(A)-(B)).  "A 'broad range of jobs in various classes,' in contrast, is the job from which a claimant was disqualified, as well as all other jobs not utilizing similar training, knowledge, and skills within 'the geographical area to which the [claimant] has reasonable access.'" *Id.* (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(A), (C)).

*LFW, Inc.*, 472 F.3d 471, 484 (7th Cir. 2006) (quoting 29 C.F.R. § 1630.2(j)(3)(i)). Rather, "the impairment must substantially limit employment generally." *Contreras*, 237 F.3d at 762. As such, Wilkes bears "the burden of presenting evidence to demonstrate that his impairment limited his ability to perform an entire class of jobs." *Id.*

To review, Dr. Lazoff restricted Wilkes from lifting from floor to waist; lifting from shoulder to overhead; lifting from waist to shoulder more than 25 pounds frequently and more than 35 pounds occasionally; carrying more than 20 pounds frequently and more than 30 pounds occasionally; and pushing or pulling more than 30 pounds frequently and 50 pounds occasionally. Dr. Lazoff also limited him to only occasional stooping, bending, kneeling, or crawling, and restricted him from operating any vibrating equipment, including a backhoe and jackhammer.

Wilkes first argues that these restrictions constitute a "disability" within the meaning of the ADA. In that regard, however, "[a]n inability to lift heavy objects may disqualify a person from particular jobs but does not necessarily interfere with the central functions of daily life." *Mack v. Great Dane Trailers*, 308 F.3d 776, 781 (7th Cir. 2002). Accordingly, "[t]he Seventh Circuit has held that a plaintiff's lifting restriction does not constitute a significant barrier to employment." *Armour v. City of Gary*, No. 2:04-cv-32, 2006 WL 1660749, at *9 (N.D. Ind. June 14, 2006); *see Contreras*, 237 F.3d at 763 (collecting cases); *Zahurance v. Valley Packaging Indus.*, No. 08-C-1104, 2010 WL 1005875, at *3 (E.D. Wis. Mar. 16, 2010) (collecting cases).

Indeed, Wilkes's restrictions are analogous to those in the significant body of Seventh Circuit case law in which the plaintiff had an impairment that interfered with work-related tasks

but did not necessarily rise to the level of a "disability" within the meaning of the ADA.[17] Specifically, in *Contreras v. Suncast Corp.*, 237 F.3d 756 (7th Cir. 2001), the Seventh Circuit Court of Appeals held that the plaintiff's inability to lift in excess of forty-five pounds for a long period of time, engage in "strenuous work," or drive a forklift for more than four hours a day, did not substantially limit him in the major life activity of working. The Court observed that the plaintiff "ha[d] not presented evidence that even hints at the notion that he is precluded from a broad class of jobs", commenting that the Court had never suggested "that forklift operation . . . is broad enough to constitute a class of jobs." *Id.* at 762-63.

Similarly, in *Peters v. City of Mauston*, 311 F.3d 835 (7th Cir. 2002), the plaintiff, who performed construction tasks and operated construction equipment for the city, injured both of his shoulders and was assigned the following permanent restrictions: never lift or carry more than fifty pounds, occasionally lift or carry between twenty-one and fifty pounds, frequently lift or carry between eleven and twenty pounds, continuously lift or carry between one and ten pounds, occasionally shovel, and use his left arm and shoulder continuously for only two hours and for no more than six hours total. The court determined that although he could not perform his particular job with the city, he was not substantially limited in working, as evidenced by the various jobs in construction he performed after his termination from the city. *See also Delgado v. Certified Grocers Midwest, Inc.*, 282 Fed. Appx. 457, 461 (7th Cir. 2008) (concluding that a

---

[17] Notably, in his response brief, Wilkes did not cite a single case concerning a plaintiff with similar physical restrictions. Nor did he attempt to distinguish the analogous cases cited by the City. *See Tripodi v. Bill Kay Old's Honda*, No. 07 C 612, 1999 WL 299901, at *5 (N.D. Ill. May 3, 1999) ("A plaintiff asserting an ADA claim has the burden on summary judgment 'to come forward with evidence that indicates [he] could meet [the] ultimate burden of showing an ADA recognized disability.'" (quoting *DePaoli v. Abbott Lab.*, 140 F.3d 668, 672 (7th Cir. 1998)); *see generally Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004) (explaining that the Court will not make a plaintiff's case for him).

shoulder injury which precluded lifting or carrying more than fifty pounds was not a disability); *Skorup v. Modern Door Corp*., 153 F.3d 512, 515 (7th Cir. 1998) (holding that an inability to perform repetitive stretching and pulling of the shoulder or lift more than ten pounds did not preclude plaintiff from the class of assembly line jobs or a broad range of other jobs); *Nuetzel*, 2009 WL 1702081, at *3 (concluding that restrictions on kneeling and crawling, which, like lifting restrictions, are common restrictions in the workplace, generally do not substantially limit one's ability to work).

Furthermore, Wilkes's assertion that he had a "disability" within the meaning of the ADA in July 2008 is directly at odds with his argument that the restrictions assigned by Dr. Lazoff should have been only temporary in nature. "Disability does not include temporary medical conditions." *Waggoner v. Olin Corp*., 169 F.3d 481, 484 (7th Cir. 1999); *see Hancock v. Potter*, 531 F.3d 474, 479 (7th Cir. 2008) (dismissing plaintiff's ADA claim where plaintiff had a work-related back injury that temporarily limited her ability to perform certain job duties). His contention of actual disability is further undercut by the fact that he had already returned to perform at least some of his Operator B duties—operating a backhoe—at the time of his termination. (*See* Wilkes Dep. 97, 100, 106 (stating that he was back operating a backhoe and could perform the "majority" of his work tasks at the time that he was terminated); *Foutz v. Sterling Constr. Mgmt., LLC*, NO. 07-cv-01524, 2009 WL 77465, at *3 (D. Colo. Jan. 12, 2009) ("The fact that [the plaintiff] continued to work operating a variety of heavy equipment [after his neck injury] demonstrates that he was not precluded from the class of jobs known as heavy equipment operator."). Perhaps realizing this inconsistency, Wilkes in his briefing seemed to

focus more on his argument that the City "regarded him" as disabled.[18]

"Under the 'regarded as' prong, the employer must believe, rightly or wrongly, that the employee has an impairment that substantially limits one or more of the major life activities." *Kupstas v. City of Greenwood*, 398 F.3d 609, 612 (7th Cir. 2005) (citation omitted). In other words, unless the City believed that Wilkes had an impairment that substantially limited his ability to perform the major life activity of working, then its actions based on a mistaken belief about Wilkes's abilities do not violate the ADA. *Id*.

Wilkes has not produced any evidence upon which to infer that the City believed that he was unable to perform a "class" or "broad range" of jobs as compared to an average person with comparable training, skills and abilities. *Nuetzel*, 2009 WL 1702081, at *3 ("[T]he Seventh Circuit and the Supreme Court have made clear that merely being excluded from a small class of jobs does not mean an individuals is disabled. Otherwise, limitations on non-major life activities (e.g., kneeling or crawling) could be transformed into major life activities by artful lawyering."). The City's termination letter specifically informed Wilkes that he was being terminated because, in light of Dr. Lazoff's permanent restrictions, he no longer met the "certain requirements of the job classification (Operator B) . . . ."[19] (Pl.'s App. Ex. 6.) He has not produced any evidence to

---

[18] Wilkes also conclusorily asserts that he meets the definition of "disability" because he has a "record of such an impairment." However, since Wilkes "fails to show that he labors under a disability, he cannot establish a 'record of' a disability under the ADA." *Armour*, 2006 WL 1660749, at *10 n.4 (citing *White v. Boehringer Mannheim Corp.*, 28 F. Supp. 2d 527, 539 (S.D. Ind. 1998)); *see Nuetzel*, 2009 WL 1702081, at *4 (E.D. Wis. June 17, 2009) (concluding that plaintiff's record of restrictions from crawling or kneeling did not rise to a condition that limited a major life activity).

[19] Wilkes suggests that the City's recommendation that he apply for long term disability benefits is evidence that it regarded him as disabled from a class or broad range of jobs. However, the termination letter makes clear that his eligibility for long term disability benefits was based on his inability to meet the physical requirements of his "current job". (Def.'s App. Ex. M.) In that regard, the policy provides that an individual becomes "totally disabled" if he is "unable to perform all of the material and substantial duties *of his own occupation*" and after benefits have been paid for twenty-four months, if he is "unable to perform all of the material and substantial duties

19

dispute the City's representation that there were no other street department positions open at the time that he could perform given his restrictions; nor has he provided evidence about the open positions upon which a reasonable jury could infer that he was perceived to be precluded from a class or broad range of jobs with the street department. *See Peters*, 311 F.3d at 844 (considering that the city, plaintiff's employer, never considered his fitness for a job other than that of "Operator" when concluding that he was not substantially limited in his ability to work). Furthermore, Wilkes's argument is undercut by the fact that his termination letter informed him that he was free to apply for other City jobs for which he was qualified. *See, e.g., McGeshick v. Principi*, 357 F.3d 1146, 1151 (10th Cir. 2004) (inviting the plaintiff to apply for other jobs within the defendant's company cut against his "regarded as" claim).

The Seventh Circuit has emphasized that except where a plaintiff's foreclosure from a substantial class of other jobs in the job market is obvious, he must present at least some evidence of the number and types of other jobs in the geographic region from which he would be excluded because of his perceived impairments. *Compare Kupstas*, 398 F.3d at 613 (finding that plaintiff's failure to provide evidence of a class or range of jobs for which he otherwise was qualified and from which defendant perceived him to be excluded, was "fatal to his case"); *Rockwell Int'l Corp.*, 243 F.3d at 1017-18 ("This is not an onerous requirement, but it does require at least some evidence from which one might infer that [the claimants] faced 'significant restrictions' in [their] ability to meet the requirements of other jobs."), *with Miller*, 643 F.3d at 196 (stating that where the employer's subjective perception of the degree of a plaintiff's impairments can be addressed through circumstantial evidence, quantitative evidence of the local

---

of any occupation for which he is or becomes reasonably qualified for by education, training or experience." (Pl.'s App. Ex. 9 (emphasis added).)

job market may be helpful but is not indispensable).

Here, Wilkes's impairments are "not so severe that his 'substantial foreclosure' from the job market is obvious." *Delgado*, 282 Fed. Appx. at 461. Although he conclusorily asserts that the permanent restrictions preclude him from performing jobs such as laying carpet or tile, painting, installing drywall, performing contracting work, performing janitorial work, operating heavy equipment, or driving a truck (Resp. Br. 10), Wilkes fails to provide *any* quantitative vocational data to support these contentions. *See, e.g., Nuetzel*, 2009 WL 1702081, at \*3 ("Jobs that require kneeling, etc., are not a 'class' of jobs or a 'broad range' of jobs."). "Without any evidence suggesting that [Wilkes] could not perform a class of jobs or a broad range of jobs in various classes, [Wilkes] has failed to raise an issue of fact as to whether his alleged impairment substantially limits his ability to work."[20] *Tripodi*, 1999 WL 299901, at \*5 ("[N]umerous courts have affirmed summary judgment decisions against plaintiffs based solely on their failure to provide proof that their lifting restrictions substantially limited them in the performance of a class of jobs."); *see Kupstas*, 398 F.3d at 615; *see generally Koszola v. Bd. of Educ. of City of*

---

[20] In any event, in *Cigan v. Chippewa Falls School District*, 388 F.3d 331, 335-36 (7th Cir. 2004), the Seventh Circuit Court of Appeals recognized a split among the circuits concerning whether a plaintiff could even rely on a perceived disability in a failure to accommodate claim and, *in dictum,* expressed doubt whether a plaintiff could do so. In that regard, several district courts in the Seventh Circuit who have confronted the issue have dismissed a failure to accommodate claim when advanced by a plaintiff who is "regarded as" disabled but not actually disabled. *See Staunton v. City of Chicago*, No. 07 C 3535, 2010 WL 1506016, at \*3 (N.D. Ill Apr. 13, 2010) (recognizing the circuit split and concluding that an actual disability was required in a failure to accommodate claim); *Green v. Pace Suburban Bus*, No. 02 C 3031, 2004 WL 157246, at \*11-12 (N.D. Ill. July 12, 2004) (discussing the circuit split and dismissing failure to accommodate claim on an alternate basis); *Ragan v. Jeffboat, LLC*, 149 F. Supp. 2d 1053, 1066 (S.D. Ind. 2001) (dismissing failure to accommodate claim where plaintiff was not actually disabled); *Cebertowicz v. Motorola, Inc.*, 178 F. Supp. 2d 949, 953-54 (N.D. Ill. 2001) (joining those courts holding that an employer has no duty under the ADA to provide a viewed-as-disabled employee with *any* accommodation); *Ross v. Matthews Emp't*, No. 00 C 1420, 2000 WL 1644584, at \*5 (N.D. Ill. Oct. 27, 2000) (adopting the position that "[n]on-disabled employees perceived as disabled by their employers are not entitled to reasonable accommodations under the ADA"). Indeed, following the 2008 ADA amendments, the EEOC amended the regulations to definitively state that an employer is "*not* required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong." 29 C.F.R. § 1630.9(e) (emphasis added).

*Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004) (emphasizing that "summary judgment is the put up or shut up moment in the lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events" (internal quotation marks and citations omitted)).

In sum, "[t]he evidence does not support an inference that [the City] believed that [Wilkes's] impairment was anything more than what it was—a limitation on his ability to do certain tasks on the job." *Mack*, 308 F.3d at 783-84. "Employers do not run afoul of the ADA when they make employment decisions based on physical or mental characteristics that are not impairments or that are limiting, but not substantially limiting such that they do not rise to the level of a disability under the ADA definition."[21] *Krocka v. City of Chicago*, 203 F.3d 507, 514 (7th Cir. 2000) (internal quotation marks and citation omitted). Therefore, the City's motion for summary judgment will be granted with respect to Wilkes's ADA claim.

### B. Wilkes's State Law Retaliatory Discharge Claim

In the alternative to his ADA claim, Wilkes claims that the City terminated him in retaliation for seeking worker's compensation benefits in violation of Indiana state law.

---

[21] Moreover, even if Wilkes could get over the "disability" hurdle, it is not apparent that the accommodation he sought—a leave of absence so that he could undergo two more surgeries—was reasonable and would enable him to return to his Operator B duties. *See generally Waggoner*, 169 F.3d at 483 ("There are limits to how far an employer must go in granting medical leave."). Dr. Cooper stated that "to what extent this [surgery] will result in relief is unclear" and that he had "no change" to Dr. Lazoff's permanent restrictions. (Def.'s App. Ex. H.) Dr. Shugart's report indicated a "success rate" in the "70-75 percent range," but also pointed out that there may be a "myofascial component" and that some of the injury to the soft tissue "may continue." (Def.'s App. Ex. H.) The City relied upon the opinion of its physician, Dr. Lazoff, who specifically concluded that Wilkes was at MMI and did not think that further intervention, including injections or surgery, would be of benefit to him. "Medical judgments are subjective and may vary from doctor to doctor, and a company is entitled to rely on the determinations made by its medical professionals, as long as that reliance is reasonable and in good faith." *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 975 n.2 (7th Cir. 2000) (citation and internal quotation marks omitted); *see Ragan*, 149 F. Supp. 2d at 1071 ("[A]n employer may ordinarily rely on its doctors' examinations and advice in making employment decision."). Here, there is no indication that Dr. Lazoff's opinion assigning restrictions was "unreasonable or in bad faith." *Bay*, 212 F.3d at 975 n.2.

Wilkes's alternative claim, however, fares no better than his ADA claim.

Under Indiana law, generally employers may terminate employees "for no cause whatsoever or for any cause at all without incurring liability." *Smeigh v. Johns Manville, Inc.*, 643 F.3d 554, 560 (7th Cir. 2011) (citation omitted). "One exception to this general rule is that an employee who has been discharged in retaliation for filing a workers' compensation claim may recover damages for wrongful termination." *Id.* (citing *Frampton v. Cent. Ind. Gas Co.*, 297 N.E.2d 425, 428 (Ind. 1973)). "To survive summary judgment on a *Frampton* claim, the plaintiff must present evidence that would support a finding that the discharge was caused by his filing for benefits." *Id.* (citing *Goetzke v. Ferro Corp.*, 280 F.3d 766, 774 (7th Cir. 2002)). "A successful litigant must demonstrate that his discharge was solely in retaliation for the exercise of a statutory right, meaning that any and all reasons for the discharge must be unlawful in order to sustain a claim." *Id.* (citing *Purdy v. Wright Tree Serv., Inc*., 835 N.E.2d 209, 212 (Ind. Ct. App. 2005)).

"Causation may not be inferred merely from evidence that the employee filed for benefits and was fired." *Id.* Where, as here, the plaintiff does not have direct evidence, "he must rely on indirect evidence of retaliatory motive, such as proximity in time between the filing of the claim and the termination or evidence that the employer's asserted lawful reason for the discharge is pretext."[22] *Id.* (quoting *Hudson v. Wal-Mart Stores, Inc*., 412 F.3d 781, 785 (7th Cir. 2005)). "[T]iming evidence is rarely sufficient in and of itself to create a jury issue on causation, but

---

[22] "Pretext can be shown by demonstrating that the employer's explanation for the firing was either dishonest or patently inconsistent with the evidence before the court." *Id.* (citation omitted). "To make this showing, an employee must produce evidence showing that (1) the employer's stated reason has no basis in fact; (2) although based on fact, the stated reason was not the actual reason for discharge; or (3) the stated reason was insufficient to warrant the discharge." *Id.* (citation omitted).

when considered with other circumstances, the temporal proximity between termination and filing of the worker's compensation claim may satisfy the plaintiff's burden in some cases[.]" *Id.* (citations and internal quotation marks omitted).

Here, Wilkes has failed to produce evidence of a causal connection between his filing of a claim for worker's compensation benefits and his termination, and thus he cannot avoid summary judgment on his *Frampton* claim. Although a three-month time span between filing his last worker's compensation claim and his termination does not preclude an inference of retaliation, *see Mack v. Great Dane Trailers*, No. TH98-0303-C-M/H, 2000 WL 33309746, at *3 (S.D. Ind. Aug. 9, 2000) (holding that a gap of one year between filing a worker's compensation claim and termination precludes an inference of causation), *with Markley Enters., Inc. v. Grover*, 716 N.E.2d 559, 565 (Ind. Ct. App. 1999) (explaining that a gap of six months, when coupled with other evidence, does not preclude an inference of relation), without any other evidence to support his claim, such proximity in time alone does not create a genuine issue of material fact. *See Smeigh*, 643 F.3d at 561; *Hudson*, 412 F.3d at 786-87.

That is especially true here, where there was one more event that led to Wilkes's termination—Dr. Lazoff's assignment of permanent restrictions—and no evidence of pretext. *See Smeigh*, 643 F.3d at 561. Wilkes has failed to produce even a shred of evidence that the City's stated reason for terminating him—that in light of Dr. Lazoff's permanent restrictions, he no longer met the requirements of the Operator B job—was dishonest. *See id.* In that same vein, Wilkes has not produced any evidence that the City's mandate that he undergo a FCE was pretext for a retaliatory motive. *See id.* Simply, Wilkes "points to nothing in the record to show that [the City's] decision to terminate him had anything to do with worker's compensation." *Id.*;

*see also Harper v. C.R. England, Inc.*, No. 2:08-cv-110, 2011 WL 3421490, at *13 (N.D. Ind. Aug. 3, 2011).

Moreover, Wilkes had filed and received worker's compensation benefits from the City on at least five occasions prior to 2008 (McAfee Aff. ¶ 51), including when he took a seven-month leave of absence in 2005 and 2006, and does not suggest that he was ever retaliated against with respect to any prior filing. This "would seem to be counter-productive to his case" of retaliation. *Mullins v. Lobdell Emery, Inc.*, NA 01-3-C, 2002 WL 459040, at *5 (S.D. Ind. Mar. 21, 2002) (finding the fact that defendant did *not* fire plaintiff for having filed previous worker's compensation claims undercut his assertion of retaliation). Because on this record there is no basis for a reasonable jury to conclude that the City's proffered reason for Wilkes's termination was a lie to cover up retaliation for filing for worker's compensation benefits, the City's motion for summary judgment on Wilkes's retaliatory discharge claim under Indiana law will be GRANTED.

## V.  CONCLUSION

For these reasons, the City's motion for summary judgment (Docket # 25) is GRANTED. The Clerk is directed to enter a judgment in favor of Defendant and against Plaintiff.

SO ORDERED.

Enter for the 26th day of August, 2011.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge